IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 20, 2006 Session

**SHANNON MAYES v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Wayne County**
**No. 13633      Stella Hargrove, Judge**

**No. M2005-02910-CCA-R3-PC - Filed March 7, 2007**

Following a jury trial, Petitioner, Shannon Mayes, was convicted of first degree murder and sentenced to life in prison. This Court affirmed his conviction on direct appeal. *State v. Shannon Mayes*, No. M2002-02091-CCA-R3-CD, 2004 WL 49111, at *1-4 (Tenn. Crim. App., at Nashville, Oct. 15, 2003), *perm. app denied* (Tenn. May 3, 2004). Petitioner then brought a petition for post-conviction relief alleging ineffective assistance of counsel. The post-conviction court subsequently denied the petition. He now appeals that denial, arguing that he is entitled to post-conviction relief because his trial counsel was ineffective in failing to file a motion to suppress his statement to police. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Stanley K. Pierchoski, Lawrenceburg, Tennessee, for the appellant, Shannon Mayes.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General, T. Michel Bottoms, District Attorney General; and J. Douglas Dicus, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Factual Background**

The facts as set forth on direct appeal are as follows:

Gary Mayes, the appellant's uncle, was a well-known store owner in Wayne County. People often referred to Mr. Mayes as "Bigun" due to his large stature. Throughout his teenage years, the appellant worked off and on at his uncle's store. However, there was a history of tension between the two, and the appellant quit working for his

uncle during the fall of 2000, when he was eighteen years old. Many people in the community also knew that Mr. Mayes carried large sums of money home from his store, and that Mr. Mayes was almost never seen without his pistol, a .44 magnum Ruger Super Black Hawk.

Shortly before midnight on April 14, 2001, Mr. Mayes left his store with Robert Kent, a friend and employee. Mr. Mayes left the store carrying a bag, some ice cream, tobacco, and a gun. Mr. Mayes drove Mr. Kent home that night after work and then proceeded to his own residence.

Joel Todd, Mr. Mayes's neighbor, fell asleep on his couch that night after watching a "ball game." Awakened by barking dogs, Mr. Todd went to the front door and turned on the carport light, but saw nothing unusual. He turned off the light and went back to the couch. About ten or fifteen minutes later, however, Mr. Todd heard six or seven gunshots at Gary Mayes's house. He called 911. Mr. Todd knew that Mr. Mayes often carried large amounts of money and a pistol. Mr. Todd could tell that more than one gun was fired and could identify the different weapons because one shot sounded "mushy," while the other made a ringing-type sound. About fifteen minutes after hearing the gunshots, Mr. Todd heard a knock at the door. The appellant identified himself and told Mr. Todd that he had been shot. Mr. Todd opened the door and asked the appellant what happened. The appellant stated that he "got into it" with his uncle, Mr. Mayes, and that "he started shooting me, so I shot him" with a 20-gauge shotgun. The appellant was wearing a camouflage shirt, shorts and a rubber glove on his right hand. He was not wearing pants or shoes. He had a hole in his left leg, just below the knee and appeared to be wounded in the right arm.

Gerald Henderson, a police officer for Clifton, Tennessee, was dispatched to Mr. Todd's residence in response to a report of gunshots. Upon arriving at the residence, Officer Henderson saw the appellant lying down in the doorway to the residence with a blood-soaked towel wrapped around his left leg and a gunshot wound to his right arm. The appellant was wearing shorts, a shirt, and a rubber glove on one hand. He was not wearing shoes. The appellant told Officer Henderson that Mr. Mayes shot him and that he shot back. Officer Henderson then proceeded to Mr. Mayes's house where he found Mr. Mayes lying in the carport in the fetal position between his truck and house. There was a large handgun laying next to him and blood everywhere.

Officer Henderson asked Mr. Mayes what happened, and he was able to tell him that someone came from behind the house and shot him. He was unable to name the shooter. Mr. Mayes had a five-to-six inch hole in his abdomen from the gunshot wounds and a wound to one of his hands and one of his legs. Officer Henderson went to his vehicle to call for emergency personnel and discovered a ski mask toboggan, a pair of tennis shoes, an 870 Remington shotgun, camouflage pants, a rubber glove turned inside out, and a spent shotgun shell. Mr. Mayes then told

Officer Henderson that the "son of a bitch" was wearing camouflage and a ski mask toboggan and stepped from behind the house, pointed a shotgun at him and fired. Mr. Mayes told Officer Henderson that his injuries were "killing" him. By the time emergency personnel arrived on the scene, Officer Henderson could see no signs of life in Mr. Mayes. Mr. Mayes was pronounced dead on arrival at Wayne County General Hospital. According to the medical examiner, he died as a result of multiple shotgun wounds that were sustained at a distance of six to nine feet.

James Berry, a deputy with the Wayne County Sheriff's Department arrived at Mr. Todd's residence sometime after 1:00 a.m. and found the appellant lying in the doorway wearing a camouflage shirt, a pair of shorts, white socks, and a rubber glove on his hand. The appellant told Deputy Berry that he "just had it [the rubber glove] on." Deputy Berry followed a blood trail from Mr. Todd's home to Mr. Mayes' home. Along the blood trail, Deputy Berry found another rubber glove. The blood along the trail was later identified as that of the appellant.

The appellant was transported via ambulance to Wayne County General Hospital and air-lifted to Vanderbilt where he underwent surgery for his wounds and remained in the hospital for approximately one week.

Deputy Steve Wilson, an investigator with the Wayne County Sheriff's Department, was also dispatched in response to the call that shots were fired on Williams Hollow Road. He recovered various items from Mr. Mayes's residence, including a rubber glove which was turned inside-out, a 20-gauge shotgun, three spent shotgun shells, camouflage pants, a ski mask, tennis shoes and a large brown bag containing over $4,000. The ski mask and the rubber glove both had blood on them. Deputy Wilson recovered a knife, a chain, and a large sum of money from Mr. Mayes's person. On April 16, 2001, Mr. Wilson interviewed the appellant and took a statement from him at Vanderbilt Medical University Hospital. The statement reads as follows:

> I worked for my Uncle Gary at [sic] store and other things since I was sixteen years old. Mostly at the store. I worked there just before December of last year, 2000. My grandfather, Walter, was real sick having crazy spells. All the kids and family was [sic] going to have a meeting at Bigun's store about Walter to decide what to do with him. Ronnie didn't show. Aunt Virginia didn't show. Papa called mom to come. Me and John took Papa home to eat. While we were gone, Mom, Diane, and Gary [got] into an argument. Mom told me that it was because Gary got on to me. I was leaving, Gary pushed me in the parking lot. My brother John came up and got in between us. I left. That is when we first got into it and been into it ever since. I quit that day. Gary accused me of stealing money from the store about a week later. This was in December of 2000. Me and Gary

have talked since then. Gary, Bigun, has told me he hates me. A couple of weeks ago I talked to Bigun at his store. We didn't get along. He said he hated people who stole money from him. Bigun accused me several times of selling drugs out of his store. I quit once because of that a long time ago. He has tried to kick me out of Papa's house before. This past Saturday, April the 14th, 2001, I babysat John's boy a little while that evening. John was in Jackson with [his] mother-in-law. I watched his boy. John came home Saturday night about 9:30 p.m. or 10:00 p.m. I left about as soon as John and Candy got there. I was driving my truck, S-10 4x4, gray. I went to Walter's house. I stopped at Bigun's store, got some Mello Yellow and a pack of cigarettes. I talked to Bigun there in the store. Bigun was telling me how I needed to straighten up. He was telling me what to do. Bigun was complaining about John, my brother, and how he needed to straighten up. The way he talked to me Saturday night made me real mad. Bigun was cussing. Bigun was always trying to run my life. I really didn't say anything to Bigun. I was trying to leave. Bigun just kept on and on saying how I needed to do things right calling me worthless and stuff. He said if I would treat him right, he would treat me right. I worked for him three years for $5.25 an hour, never got a raise. I finally got to leave. I told him I was leaving. It was about fifteen till 11:00 p.m. I left Biguns and went to Bigun's house in my truck, the S-10 4x4. I parked in front of Joel Todd's house on the side of the road. This was about fifteen after 12:00, midnight. I had rode around for a while and had went to Walter's house. There was a half case of beer in [the] truck, but I did not drink anything Saturday night. I got out of my truck. I got my shotgun, a twenty gauge pump. I was wearing camo pants and camo t-shirt. I didn't have the toboggan on. It was in my pocket. I was going down to Bigun's porch to wait on him to get home so I could talk to him. I carried my shotgun because Bigun always carried that big gun. I went down to Bigun's and waited [on] him. I was on the porch when Bigun got home in his white Ford truck. When Bigun got out of his truck he told me to leave that I wasn't welcome at his house. Bigun said he didn't like people who stole from him. I had laid my shotgun beside the porch. Big was holding a big bag, his gun and his keys. Bigun was cussing and screaming. I told him if that is the way he was going to be I didn't have to have nothing to do with him. I picked up my shotgun. Bigun was cussing. I was standing in the grass in front of the truck. Bigun was beside his truck door. That is when I told him I didn't want nothing to do with him anymore. He was cussing. Bigun shot at me. I don't think Bigun meant to hit me. He was telling me to get the hell out of his yard. I think that is when I got hit

in the leg. I felt the sting. I turned and shot Bigun. I think I hit him in the stomach. Bigun fired again and hit me in the right arm and shot at me two more times. I ran to the edge of the porch on the passenger's side of his truck. I was hiding behind [the] pillar. Bigun was lying on the ground beside his truck. That is when he shot at me two more times. I fired two shots. One shot, I shot at Gary under the truck. The second shot in his direction, I don't think I hit anything. I could see Gary's feet. I saw him role [sic] over on his side and face the wall. I seen his gun lying beside him. I was sure he wasn't going to shoot at me again. That is when I got up and started to Joel's house. I had put one glove on my right hand. It was a rubber glove. I put this glove on my right-hand when Gary and I first got into it in front of his truck. I put the glove on just in case something happened. That's when-That's when he shot at me the first time. The other glove I didn't have time to put on. I thought I dropped the other glove in the yard at Bigun's before I left to go to Joel's house. I took my camo pants off to see how bad I was hurt. I took off my shoes too. I guess the toboggan was lying there with the other stuff at the porch. I walked to Joel's and knocked on the door with my head. Joel came to the door. I told Joel that I had shot Bigun and that Bigun had shot me to call me an ambulance. Joel said he already did. I laid in the door at Joel's until the ambulance got there and remember the helicopter ride. This is my statement given to Investigator Steve Wilson. I am clear minded and understand completely what I have told Investigator Wilson and that it is the truth. I asked Investigator Wilson to write my statement and I have read this statement and it bares my signature.

At trial, however, the defendant testified that his statement was not entirely accurate. At trial, he claimed that after babysitting for his brother, John, he went to the home he shared with his grandfather to get "stuff" ready to go coyote hunting the next morning. While he was home, his grandfather "got a chemical imbalance in his head." The appellant went to get help from Mr. Mayes because he did not want to send his grandfather to the hospital without telling anyone. He parked in front of Mr. Todd's house, over 200 yards away, because he was afraid Mr. Mayes might try to "whoop" him. He took his shotgun, which was loaded from a prior hunting trip, "just in case." He waited on Mr. Mayes's porch for about ten minutes for him to arrive. Mr. Mayes asked him why he was there, and the appellant told him that his grandfather was "saying crazy stuff." He did not seek help from his brother because he had been in Jackson all night visiting his mother-in-law. The appellant asked Mr. Mayes if he would stay with the grandfather the next day. He also accused Mr. Mayes of not giving the grandfather his medicine. Mr. Mayes did not feel this was any of the appellant's business. The appellant stated that at that point, he picked up

his shotgun and began to leave when Mr. Mayes began screaming and cussing. The appellant told Mr. Mayes that he was going to leave and that he only came to get his grandfather some help, but that when he turned around, Mr. Mayes shot him in the leg. The appellant fired a shot at Mr. Mayes and "took off running." Mr. Mayes fired two more shots, one of them hitting the appellant in the arm, before the appellant was able to hide behind a column in the carport. By this point, Mr. Mayes was down on the floor of the carport. The appellant fired two more shots at him and Mr. Mayes again returned fire. The appellant then took off his pants and shoes to see the extent of his injuries. He thought that the toboggan probably fell out his pants pocket. He could hear Mr. Mayes moving around. He took off towards Mr. Todd's house to get help. When he arrived, he told Mr. Todd that he had just been shot and that he shot Mr. Mayes.

On cross-examination, the appellant claimed that he was "out of it" when he gave the statement to Deputy Wilson because he was under the influence of morphine and that he did not remember receiving his Miranda rights. He acknowledged, however, that he did not mention the situation regarding his grandfather in his statement to Deputy Wilson. He stated that he brought the gloves with him to Mr. Mayes's because one of his hunting dogs, which were kept at his brother John's house, was supposed to have puppies that night. He explained that he was planning on going back to his brother's house sometime that night so that he and his brother could check on the dog. John Mayes testified that one of the dogs did indeed have puppies that night, but that he was unaware of the appellant's plan to return to his house to check on the dog. John Mayes also admitted that the 20-gauge shotgun belonged to him, that he had not given the appellant permission to use the gun, and that he did not know how long the appellant had possession of the gun prior to the incident.

Several friends of Mr. Mayes and the appellant testified at trial. Timothy Lambert, Mr. Mayes's friend, was at the store that night from about 10:30 p.m. until midnight. He did not see the appellant. David Hill, the appellant's friend, recalled an argument between Mr. Mayes and the appellant. He also remembered that approximately one month prior to the incident, the appellant needed money to prevent his truck from being repossessed. Several other people testified that the appellant was in need of money. Lisa Cox, who was friends with Mr. Mayes and the former girlfriend of the appellant, recalled an argument about two weeks prior to the incident in which Mr. Mayes told the appellant to get a job, and the appellant threatened to kill Mr. Mayes. Garla Hill testified that the appellant owed Mr. Mayes money.

*State v. Shannon Mayes*, No. M2002-02091-CCA-R3-CD, 2004 WL 49111, at *1-4 (Tenn. Crim. App., at Nashville, Oct. 15, 2003), *perm. app denied* (Tenn. May 3, 2004).

## II. Post-conviction Hearing

Although Petitioner raised several issues in both his pro se and amended petitions for post-conviction relief, he raises only one issue on appeal. That issue is whether trial counsel was ineffective in failing to file a motion to suppress Petitioner's statement to police. The facts as relevant to the sole issue on appeal are as follows:

At the post-conviction hearing, Investigator Steve Wilson, of the Wayne County Sheriff's Department, testified that he took a statement from Petitioner at the Vanderbilt University Medical Center where he was being treated for injuries following the incident. The charge nurse signed a release giving Investigator Wilson permission to interview Petitioner. At the time of the interview, the nurse described Petitioner as "awake, alert, and oriented." Prior to taking Petitioner's statement, Investigator Wilson questioned Petitioner about his personal information, such as address, date of birth, and full name. Petitioner appeared coherent and gave accurate answers to all questions. Investigator Wilson then proceeded with the interview. Investigator Wilson explained that the interview actually took place more in the form of a narrative, with Petitioner giving his version of the events which took place prior to and during the incident.

Investigator Wilson did not present Petitioner with the evidence that had been recovered from the scene. However, he said that Petitioner's statement was consistent with the evidence recovered from the scene, and Petitioner knew details that only someone present during the crime could know. Investigator Wilson transcribed the statement which he said was very lengthy and was given in great detail. He said that at no point did Petitioner say that he wanted to change a portion of his statement, and, in fact, Petitioner initialed each page of the written statement after its completion.

According to Investigator Wilson, Petitioner remained in control of his faculties throughout the interview. Petitioner understood what was being said to him and what he was saying. Investigator Wilson stated that Petitioner was "very aware of not only what he was telling me, but of the whole proceeding going on that day." He said Petitioner's demeanor changed little during the interview, he remained "awake," "alert," and "very conscious." He further stated that Petitioner gave reasonable answers to the questions asked, understood what was being discussed, and was fully aware of his *Miranda* rights and the fact that he repeatedly waived those rights throughout the interview. Investigator Wilson had no qualms about interviewing Petitioner. He said he would have refrained from conducting the interview had Petitioner appeared incoherent or intoxicated. Investigator Wilson read Petitioner his *Miranda* rights. Petitioner acknowledged that he understood his *Miranda* rights, and then said that he wished to make a statement.

Petitioner testified that he did not remember giving his statement to police following the incident. He was aware that he was in the hospital when the statement was given, but could not remember the substance of the interview. Petitioner did not recall waiving his *Miranda* rights. He likewise did not recall being told that he did not have to speak with the officers if he did not want to. Petitioner was not aware of the amount of morphine in his body at the time of his statement.

Trial counsel advised Petitioner that his statement to police could be used against him at trial. Petitioner said that he told trial counsel that he could not recall his statement to the police. Petitioner could not recall any discussion with trial counsel regarding suppression of the statement. Trial counsel advised him that it would be in his best interest to testify at trial and Petitioner took his attorney's advice. He recalled testifying at trial that portions of the statement he gave to police were not accurate. He admitted, however, that the substance of his statement to police and his testimony at trial were essentially the same. He acknowledged that he had the opportunity to explain any inaccuracies in the statement to the jury when he testified at trial. He also acknowledged that it was his decision whether to testify at trial.

Trial counsel testified that he did not file a motion to suppress Petitioner's statement because he did not feel it was a crucial piece of evidence upon which the State could hang a conviction. He said the most important statement to suppress was the victim's dying declaration implicating Petitioner in his death. Trial counsel did not feel that Petitioner would be successful at trial if the dying declaration was admitted into evidence.

Given that trial counsel was unsuccessful in suppressing the dying declaration, he said that he felt the best alternative for a lesser sentence was to put Petitioner on the stand in an attempt to elicit sympathy from the jury. He said that although the facts and evidence against Petitioner were "terrible," he felt the defense's best asset was Petitioner himself. Trial counsel described Petitioner as a young, good-looking, soft-spoken defendant, who had himself sustained terrible injuries during the incident. Trial counsel's hope was that the jury would think it was impossible that a mild-mannered individual such as Petitioner was capable of committing first degree murder.

Once it was determined that Petitioner would testify, trial counsel said he did not feel that it was worthwhile to file a motion to suppress the statement to police. He explained that he was aware that Petitioner felt that various aspects of the statement were inaccurate and that Petitioner planned to clarify those inaccuracies with his testimony. Trial counsel was also aware that if Petitioner's testimony differed in the least from what he said in his statement, the statement would be used to impeach his credibility. Nonetheless, trial counsel said that Petitioner's statement to police "substantially conformed" to the testimony he was going to give at trial, such that the benefit of Petitioner's testimony far outweighed any possible harm caused by admission of the statement. Moreover, trial counsel said that the other evidence proved the State's case without Petitioner's statement to police. He said that it was beneficial for Petitioner to testify and offer an explanation for the incriminating physical evidence regardless of whether the statement was admitted.

Dr. James O'Donnell testified as an expert in pharmacology at the post-conviction hearing. Dr. O'Donnell explained the effects of morphine on the human brain and the impact the drug has on an individual's decision-making ability. Specifically, he explained that morphine significantly depresses the central nervous system, affecting all areas of the brain, and inhibits an individual's cognitive ability to engage in decision-making activities. He said that a nurse's description of a patient as "alert, awake, and oriented" does not mean that a patient is not cognitively impaired, only that the patient is responding and is aware of his or her surroundings.

After reviewing Petitioner's hospital records, interviewing Petitioner, and considering the pharmacology of morphine, Dr. O'Donnell opined that the morphine administered to Petitioner hindered his ability to freely and voluntarily relinquish his right against self-incrimination, i.e. his *Miranda* rights. He said that an average person receiving the same amount of morphine administered to Petitioner, would be predictably impaired and intoxicated by the effects of the drug. This patient would likewise not be able to deliberate clearly and consider the consequences of any decisions made while under the influence of the drug. With respect to waiving one's *Miranda* rights, Dr. O'Donnell said that a hospital should not allow a patient to make a decision of this magnitude while experiencing the effects of morphine.

On cross-examination, Dr. O'Donnell admitted that he was not present in the hospital on the day Petitioner gave his statement. Accordingly, he admitted that he did not know precisely what effect the morphine had on Petitioner's cognitive abilities. He admitted that hospital personnel who evaluated Petitioner at the time of the statement could make a more accurate determination regarding his cognitive abilities. He explained that his opinion regarding Petitioner's ability to waive his *Miranda* rights was based solely on the pharmacology of morphine. Dr. O'Donnell also admitted that although morphine has the same effect on every person, the degree to which a person is impacted by the morphine's effects varies between individuals. Finally, he admitted that Petitioner's statement did not reflect the thoughts of someone who was confused or operating under the effects of morphine.

## III. Standard of Review

As stated above, the sole issue Petitioner raises on appeal is whether trial counsel was ineffective in failing to file a motion to suppress Petitioner's statement to police following the incident. When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). The error must be so serious as to render an unreliable result. *Id*. at 687, 104 S. Ct. at 2067. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. *Id*. at 695, 104 S. Ct. at 2067. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner bears the burden of proving his allegations by clear and convincing evidence. T.C.A. § 40-30-210(f). The findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *See Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields v. State*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

## IV. Analysis

Petitioner argues that his statement to police should have been suppressed because it was not freely and voluntarily given and was therefore given in violation of his *Miranda* rights. Petitioner argues that the statement was not freely and voluntarily given because at the time he gave the statement, he was cognitively impaired as a result of the intravenous morphine being administered to him by the hospital. As such, Petitioner asserts that he was mentally incapable of making a decision to waive his *Miranda* rights. He argues that trial counsel was aware of this impairment, and accordingly should have moved to suppress the statement. He contends that he was prejudiced by trial counsel's actions because had the jury not heard Petitioner's statement to police, it could have acquitted Petitioner or convicted him of a lesser included offense.

With respect to this claim, the post-conviction court found as follows:

Based on the cross-examination testimony of Dr. O'Donnell, together with nurse D'Apalito's signed statement . . . the Court finds the statement to have been voluntarily made and given. Again, the statement was an explanation of the physical evidence that [Petitioner] knew to exist. The statement was made in such a way to explain the physical evidence in a light most favorable to [Petitioner].

. . . .

The statement given at the hospital, according to [trial counsel] explained the physical evidence found at the scene as favorably for [Petitioner] as could be expected. It was consistent with what [Petitioner] was expected to testify and

ultimately did testify. [Trial counsel] testified he wanted the statement to come in as evidence.

. . . .

The court finds no ineffective assistance of counsel in either failing to move to suppress the statement or failing to object to its introduction at trial. [Trial counsel] stated that he wanted the statement to come in. The trial tactics of the [defense counsel] appear to be well reasoned based on the proof introduced in the State's case in chief. The statement was not a confession. The statement was consistent with the testimony given at trial by [Petitioner] to explain what happened that night.

After a thorough review, we find nothing in the record which preponderates against the trial court's findings. This Court has previously stated that "if arguable grounds exist to suppress incriminating evidence, then an attorney, as a zealous advocate for the client, should move to suppress that evidence." *Stephen Bernard Wlodarz v. State*, No. E2002-02798-CCA-R3-PC, 2003 WL 22868267, at *6 (Tenn. Crim. App., at Knoxville, Dec. 3, 2003), *perm. app. denied* (Tenn. May 17, 2004). Where there are no arguable grounds to suppress, the attorney is not ineffective by refraining from filing a motion to suppress. *See Id.*

In the case herein, Investigator Wilson testified that the statement was essentially a voluntary narrative, offered by Petitioner, explaining his version of the events, with little or no questions being asked of Petitioner. He further stated that Petitioner did not appear intoxicated and was cognizant of what was going on throughout the proceedings, including his repeated decision to waive his *Miranda* rights. At the conclusion of the interview, Petitioner initialed each page of the lengthy statement as transcribed by Investigator Wilson.

Dr. O'Donnell, the expert pharmacologist, admitted on cross-examination that there was nothing in his review of the statement to indicate that Petitioner was confused or that his cognitive abilities were impaired by morphine at the time the statement was given. Dr. O'Donnell further testified that morphine may effect individuals' cognitive abilities to varying degrees. Accordingly, he stated that medical personnel present at the time of the statement would be in the best position to determine a patient's cognitive abilities. Immediately prior to Petitioner's statement, the hospital charge nurse described Petitioner as "awake, alert, and oriented." The charge nurse then signed a waiver indicating Petitioner was competent to participate in the interview and giving Investigator Wilson permission to conduct the interview with Petitioner. On these facts, we cannot conclude that Petitioner was incapable of making a cognitive decision to waive his *Miranda* rights.

Moreover, trial counsel testified that he felt it was in his client's best interest to testify at trial, and, in light of this fact, he felt it was unnecessary to file a motion to suppress the statement. Specifically, trial counsel was aware that Petitioner's statement would likely be introduced at trial to impeach his trial testimony. Nonetheless, he testified that considering the physical evidence, the beneficial value of Petitioner's testimony far outweighed any harm that would be caused by allowing

the jury to hear Petitioner's statement. Trial counsel said this was particularly true given that Petitioner's statement to police and his trial testimony were substantially similar. In any event, trial counsel said that other evidence was sufficient to prove the State's case, and the statement was not necessary for a conviction.

In our view, Petitioner presented no evidence to support a conclusion that his statement to police would have been suppressed. Thus, he has failed to show that trial counsel was ineffective in refraining from filing a motion to suppress or that trial counsel's actions were anything less than trial strategy. Even were we to conclude that counsel was deficient in his decision not to suppress the statement, Petitioner has not demonstrated that he was prejudiced by trial counsel's performance. Specifically, he has not shown that the outcome of his trial would have been different had trial counsel filed a motion to suppress his statement to police. Accordingly, Petitioner is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE